UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | |
|---|---|
| CALVIN S., ) | |
| ) | |
| Plaintiff, ) | No. 22-cv-6195 |
| ) | |
| v. ) | |
| ) | Magistrate Judge Keri L. Holleb Hotaling |
| MARTIN J. O'MALLEY, Commissioner ) | |
| of the Social Security Administration, ) | |
| ) | |
| Defendant. ) | |

### MEMORANDUM OPINION AND ORDER

Plaintiff Calvin S.[1] appeals the decision of the Defendant Commissioner ("Commissioner") of the Social Security Administration ("SSA") denying him disability benefits. For the reasons set forth below, Plaintiff's motion for summary judgment (Dkt. 12) is DENIED[2]; the Commissioner's motion for summary judgment (Dkt. 15) is GRANTED. The Commissioner's decision is affirmed.

**I.  BACKGROUND**

**A.  Procedural History**

According to the ALJ, on May 11, 2021, Plaintiff filed an application for disability insurance benefits ("DIB"), alleging disability beginning on March 22, 2021.[3] (R. 16.) Plaintiff's application was denied initially and upon reconsideration. (R. 69-73, 75-81.) An Administrative Law Judge ("ALJ") held an Administrative Hearing and subsequently issued a June 29, 2022 decision finding that Plaintiff was not disabled. (R. 16-29.) On September 6, 2022, the Appeals

---

[1]  In accordance with Northern District of Illinois Internal Operating Procedure 22, the Court refers to Plaintiff only by his first name and the first initial of his last name(s).

[2]  Plaintiff has filed a brief seeking remand (Dkt. 12), which the Court construes as a motion for summary judgment.

[3]  The ALJ included these filing and disability dates in his decision (R. 16), and Plaintiff reports the same application filing date in his brief. (Dkt. 12 at 1.) The record version of Plaintiff's DIB application indicates that it was filed on June 7, 2021, with an alleged disability onset date of February 25, 2021. (R. 155-56.) The reason for these date discrepancies is unclear, but the discrepancies have no apparent bearing on the issues Plaintiff raises.

Council denied Plaintiff's request for review (R. 1-9), rendering the ALJ's decision the final decision of the Commissioner, reviewable by the district court under 42 U.S.C. § 405(g). *See* 20 C.F.R. § 404.981; *Haynes v. Barnhart*, 416 F.3d 621, 626 (7th Cir. 2004). Plaintiff filed this lawsuit seeking review of the ALJ's decision (Dkt. 1), and the case was reassigned to Magistrate Judge Keri L. Holleb Hotaling's initial caseload when she assumed the bench (Dkt. 21).

### B. The ALJ's Decision

The ALJ analyzed Plaintiff's claim following the SSA's usual five-step sequential evaluation process to determine whether Plaintiff was disabled during the relevant period. (R. 16-29); *see also* 20 C.F.R. §§ 404.1520(a). The ALJ found at step one that Plaintiff met the insured status requirements of the Social Security Act through December 31, 2025 and had not engaged in substantial gainful activity since his alleged 2021 disability onset date. (R. 19.) At step two, the ALJ concluded that Plaintiff had severe and non-severe impairments, which the ALJ listed and discussed. (*Id*.) The ALJ concluded at step three that Plaintiff's impairments, alone or in combination, did not meet or medically equal one of the SSA's listings of impairments. (R. 19-22.)

Before step four, the ALJ determined Plaintiff retained the residual functional capacity ("RFC") "to perform medium work as defined in 20 CFR 404.1567(c)," with some exertional, postural, and environmental limitations. (R. 22-23.) At step four, the ALJ concluded Plaintiff would be able to perform past relevant work. (R. 28.) Accordingly, the ALJ ended the analysis and concluded Plaintiff was not disabled under the Social Security Act. (R. 29.)

### C. Standard of Review

On review, the Court does not "merely rubber stamp the ALJ's decision"; instead, "[t]he findings of the Commissioner of Social Security as to any fact, if supported by substantial evidence, shall be conclusive." 42 U.S.C. § 405(g); *Prill v. Kijakazi*, 23 F.4th 738, 746 (7th Cir.

2022). "Substantial evidence is not a high threshold, as it means only 'such relevant evidence as a reasonable mind might accept as adequate to support a conclusion[,]'", and "a claimant bears the burden of proving []he is disabled." *Prill*, 23 F.4th at 746 (quoting and citing *Biestek v. Berryhill*, 139 S. Ct. 1148, 1154 (2019)).

The ALJ need only "'minimally articulate'" the "'justification for rejecting or accepting specific evidence of a disability'" to satisfy the "lax" standard. *Berger v. Astrue*, 516 F.3d 539, 545 (7th Cir. 2008) (quoting *Rice v. Barnhart*, 384 F.3d 363, 371 (7th Cir. 2004)). Under this standard, the Court is not to try the case *de novo* or supplant the ALJ's findings with the Court's assessment of the facts, whether as to credibility or conflicting record evidence. *Young v. Barnhart*, 362 F.3d 995, 1001 (7th Cir. 2004); *Schmidt v. Apfel*, 201 F.3d 970, 972 (7th Cir. 2000). If there is substantial evidence, the Court must affirm even if "reasonable minds could differ" or the evidence would support another conclusion. *Elder v. Astrue*, 529 F.3d 408, 413 (7th Cir. 2018); *Scheck v. Barnhart*, 357 F.3d 697, 699 (7th Cir. 2004).

**II.    ANALYSIS**

Plaintiff argues that the ALJ's RFC is contrary to law and not supported by substantial evidence in two ways because it (1) improperly omitted limitations as to "the aftereffects of cancer and treatment for cancer" and (2) does not fully account for Plaintiff's right upper extremity limitations. Plaintiff also argues that the RFC is flawed because the ALJ did not appropriately conduct a subjective-symptoms analysis.[4]

---

[4] As the Commissioner points out, Plaintiff's argument appears to "conflate[] two aspects of the ALJ's analysis—the subjective-symptom evaluation and the RFC analysis." (Dkt. 16 at 7.) For completeness and clarity, the Court has separated its analyses of Plaintiff's arguments regarding the RFC and the subjective-symptom evaluation.

### A. The ALJ's Assessment

The ALJ found that Plaintiff had the severe impairments of degenerative changes in the lumbar spine; de Quervain's tenosynovitis in his right wrist;[5] vertigo; and bursitis in his right foot. (R. 19.) The ALJ also found Plaintiff had the non-severe impairments of prostate cancer, acid reflux, sleep difficulties, fatty liver, a thyroid nodule, and pulmonary nodules. (*Id*.) Because Plaintiff raises challenges as to the RFC regarding only his prostate cancer and treatment and de Quervain's tenosynovitis, the Court details facts only as to those conditions.

Plaintiff was diagnosed with prostate cancer in October 2020 but did not pursue treatment until April 2021. (R. 19.) In April 2021, Plaintiff's oncologist, Olaide Ajayi, M.D., noted Plaintiff had no pain and had not yet begun treatment. (*Id*.) Tests were negative for metastatic disease. (*Id*.) Dr. Ajayi, and a radiation oncologist, Corbin Johnson, M.D., after consultation agreed Plaintiff should begin androgen deprivation therapy (Lupron injections) that would persist for two to three years; after two months of those treatments, Plaintiff would begin a forty-day course of radiation. (R. 19-20.) In July 2021, approximately two months after he had begun the androgen deprivation therapy, Plaintiff reported some hot flashes and nocturia and anticipated beginning radiation soon. (R. 19.) In September 2021, Dr. Johnson saw Plaintiff after Plaintiff completed radiation and concluded Plaintiff's reported symptoms, which included weakness, night sweats, and insomnia, were attributable to the androgen deprivation therapy rather than the shorter-term radiation treatments. (R. 20.) In October 2021, Dr. Ajayi noted that Plaintiff reported some hot flashes and difficulty sleeping but also that he continued normal activities and felt well overall. (*Id*.) Dr. Ajayi continued Plaintiff's androgen deprivation therapy with injections every twelve weeks and a three-

---

[5] De Quervain's tenosynovitis is a "painful condition affecting the tendons on the thumb side of the wrist." *Cruz v. Berryhill*, No. 16-cv-5126, 2017 WL 4678226, at *2 (N.D. Ill. Oct. 17, 2017); Stedman's Medical Dictionary 902190 (defining condition as "inflammation of the tendons of the first dorsal compartment of the wrist, which includes the abductor pollicis longus and extensor pollicis brevis; diagnosed by a specific provocative test (Finkelstein test)").

month follow-up appointment. (*Id*.) In January 2022, Plaintiff reported hot flashes and fatigue. (*Id*.) At Plaintiff's appointments in April and October 2021 and in January of 2022, Dr. Ajayi described Plaintiff's status as "fully active, able to carry on all pre-disease performance without restriction." (R. 19, 20.) Dr. Ajayi also repeatedly noted that Plaintiff had no signs or symptoms of active or recurrent prostate cancer. (R. 20.) The ALJ stressed that he did "not mean to imply that the claimant's prostate cancer and treatment for prostate cancer [were] insignificant event[s] in [Plaintiff's] life" but that he "conclude[d] that [Plaintiff's] prostate cancer did not significantly limit his ability to do basic work-related activity for a consecutive period of at least 12 months and therefore [] is a non-severe impairment." (R. 20-21.)

In March 2021, Plaintiff reported right wrist pain with no known inciting injury. (R. 25.) He was fitted with a wrist brace that did not lead to improvement. (*Id*.) In June 2021, Plaintiff submitted a function report in which he indicated he could lift only twenty to thirty pounds. (R. 23, 197.) In July 2021, radiographs revealed no fractures, dislocations or other acute osseous abnormalities, and orthopedists diagnosed Plaintiff with de Quervain's tenosynovitis. (R. 25.) Plaintiff was not interested in injections or surgery at the time, so he was prescribed a topical anti-inflammatory gel and a removable thumb spica brace and referred to occupational therapy. (*Id*.) Occupational therapy provided temporary relief, and Plaintiff reported he continued normal activities, working through pain. (*Id*.) Plaintiff later received a steroid injection. (R. 25, 51.) In June and September 2021, Plaintiff completed functional reports in which he reported difficulty shaving, dressing, sweeping, and mopping due to wrist pain. (*Id*. at 25-26.) He continued to have, *inter alia*, wrist tenderness, pain aggravated by gripping and pinching, and decreased grip strength in examinations in March 2022. (R. 25.) Plaintiff's wrist did not have motion deficits, weakness, instability, or neurological dysfunction. (*Id*.) Plaintiff wore a wrist brace during the Administrative Hearing and testified that sweeping, mopping, and other tasks caused his wrist to ache. (R. 26.)

5

The ALJ considered the opinions of the state-agency consultants in reaching a decision. The ALJ found the October 21, 2021 opinion of the reconsideration-level state agency medical consultant, Jacqueline Fister, M.D., "more persuasive" than that of the initial-level medical consultant, who addressed only Plaintiff's prostate cancer and no other claimed impairments. (R. 27, 78-79.) According to the ALJ, Dr. Fister "more thoroughly considered" Plaintiff's impairments and determined Plaintiff "retained the ability to perform a range of medium exertional work activity on a full-time sustained basis." (R. 27.) The ALJ "conclude[d] [Plaintiff's] de Quervains tenosynovitis is a severe impairment[,]" but it did "not preclude [Plaintiff's] ability to perform full-time sustained work activity requiring lifting, carrying, pushing, and/or pulling 50 pounds no more than occasionally and 25 pounds no more than frequently with no more than frequent handling and fingering with the upper right extremity." (*Id*.) The ALJ drew the foregoing exertional and postural limitations directly from Dr. Fister's opinion, except that the ALJ added the final limitation of only "frequent" handling and fingering with Plaintiff's right hand. (R. 26, 27, 78-79.)

State agency psychological consultants at both the initial and reconsideration levels found that Plaintiff had no medically determinable mental impairment. (R. 27.) The ALJ deemed these opinions persuasive because of their consistency with Plaintiff's reported activities and the lack of mental health complaints or treatment in the record. (*Id*.)

The ALJ determined that Plaintiff's "statements concerning the intensity, persistence, and limiting effects of [his reported] symptoms [we]re not fully supported." (R. 24.) The ALJ found Plaintiff had the overall RFC "to perform medium work as defined in 20 CFR 404.1567(c), except" that "[h]e c[ould] lift and/or carry 50 pounds occasionally and 25 pounds frequently"; "stand and/or walk for up to 6 hours total in an 8-hour workday"; "sit for up to 6 hours total in an 8-hour workday"; "push and/or pull within the lift/carry weight limits"; "occasionally climb ramps and

6

stairs" but "never climb ladders, ropes, or scaffolds"; "frequently balance"; "frequently handle and finger with the upper right extremity"; and was "unlimited in the ability to stoop, kneel, crouch, and crawl" but "should avoid all exposure to hazards (unprotected heights and moving mechanical parts)."[6] (R. 22-23.)

Plaintiff is or previously was in the Army Reserves, during which he worked in at least two positions as a paralegal; he also has held at least two other paralegal positions and worked as a mortgage loan closer and an investigator. (R. 28.) The impartial vocational expert ("VE") testified at Plaintiff's hearing that Plaintiff's past jobs as a mortgage loan closer and investigator, as generally and actually performed, do not exceed the medium work RFC with the limitations set by the ALJ. (R. 28, 59, 61-65.) She also testified that, as generally performed, paralegal work would not exceed that RFC. (R. 28.) As actually performed, though, only two of Plaintiff's paralegal jobs would not exceed the RFC; the others, in positions for the Army, typically require fitness testing and field work, and thus were performed at the heavy exertional level, above the RFC the ALJ had set. (R. 28, 61-63.) That said, the VE also testified that, if the exertion limitation as to lifting and carrying were "20 pounds occasionally and 10 pounds frequently," all past work "would remain," except "not necessarily as [Plaintiff] performed it to the maximum lifting in the military." (R. 64.) The ALJ found the VE's testimony consistent with the information contained in the Dictionary of Occupational Titles and that, except for two military paralegal positions, Plaintiff could perform his past relevant work as a paralegal, mortgage loan closer, and investigator. (R. 29.)

---

[6] These limitations also correspond closely to Dr. Fister's recommendations, except that, in addition to the handling and fingering limitation the ALJ added, the ALJ also added a balance limitation. Although Dr. Fister opined that, because of his "dizziness," Plaintiff could never climb ladders, ropes and scaffolds and only occasionally climb ramps or stairs but could do "unlimited" balancing (R. 78), the ALJ limited Plaintiff to only "frequent" balancing (R. 26). Dr. Fister further acknowledged Plaintiff's reports of issues with concentration but determined he was not limited to unskilled work. (R. 77, 80.)

7

### B. The RFC Was Supported by Substantial Evidence

Plaintiff asserts that the ALJ insufficiently considered the "ongoing effects of Plaintiff's cancer, including hormonal therapy and side effects" and the symptoms of his de Quervain's tenosynovitis when determining the RFC. (Dkt. 12 at 8-9.)

Beginning with Plaintiff's cancer and treatment, as the ALJ noted, Plaintiff's oncologist consistently stated that Plaintiff had "no signs or symptoms of active prostate cancer" (R. 19, 20, 1376; *see also* R. 1359), and Plaintiff cites nothing to indicate Plaintiff has ongoing cancer or direct effects attributable to the prostate cancer itself. Accordingly, the Court finds no error in the ALJ's assessment as to whether any cancer symptoms (none were described) were ongoing.

Plaintiff asserts that the ALJ was required to account for side effects of Plaintiff's cancer treatment with unspecified "mental limitations" to "account for [Plaintiff's] impaired concentration." (Dkt. 12 at 8.) But the ALJ did address Plaintiff's androgen deprivation therapy, noting that it was expected to continue for two to three total years, and acknowledged that, at various points during treatment (and the shorter-term radiation treatment), Plaintiff complained of hot flashes, night sweats, fatigue, difficulty concentrating, and insomnia.[7] (R. 20, 23-24.) The ALJ stressed that Plaintiff's oncologist, Dr. Ajayi, had repeatedly indicated Plaintiff was "[f]ully active, **able to carry on all pre-disease performance without restriction**." (R. 20, 23-24, 1359, 1376 (emphasis added).) The ALJ found those "repeated notations" to be "well supported" and that Plaintiff's "prostate cancer did not significantly limit his ability to do basic work-related activity for a consecutive period of at least 12 months." (R. 20-21.) Further, the ALJ noted that state-agency

---

[7] Plaintiff lists vertigo among his treatment-related symptoms (Dkt. 12 at 6), but Plaintiff had told medical personnel that his vertigo began before cancer treatment (R. 26), and the ALJ addressed vertigo with a postural limitation restricting Plaintiff to only frequently balancing. (R. 23, 26.) Plaintiff does not acknowledge that postural limitation or identify any other vertigo-related limitation supported by the record. Moreover, the ALJ's opinion was more restrictive than the opinion offered by Dr. Fister that Plaintiff could do unlimited balancing. (R. 78.) *See Best v. Berryhill*, 730 F. App'x 380, 382 (7th Cir. 2018) ("There is no error when there is 'no doctor's opinion contained in the record [that] indicated greater limitations than those found by the ALJ.'") (alteration in original) (quoting *Rice v. Barnhart*, 384 F.3d 363, 370 (7th Cir. 2004)).

8

psychological consultants at both levels opined that Plaintiff had "no medically determinable mental impairment," which the ALJ found persuasive due to consistency with Plaintiff's self-reported activities and his lack of mental health complaints or treatment. (R. 27.)

These opinions augment the ALJ's determination as to the RFC relating to Plaintiff's cancer treatment, *see Prill*, 23 F.4th at 749; *Jones v. Astrue*, 623 F.3d 1155, 1162 (7th Cir. 2010), even if the Court might have reached a different conclusion on the record evidence. *See Prochaska v. Barnhart*, 454 F.3d 731, 737 (7th Cir. 2006) (noting that "[t]he ALJ decided that 'a mental impairment is not medically determinable in this matter,' because [plaintiff] failed to allege a disabling mental impairment and had not 'sought any psychological or psychiatric treatment,' and the 'state psychologists who reviewed this matter concluded that there was no medically determinable mental impairment'").

As to Plaintiff's de Quervain's tenosynovitis, Plaintiff attacks the ALJ's findings that he could perform frequent handling and fingering and lift, carry, push, and pull twenty-five pounds frequently and fifty pounds occasionally with his right upper extremity. (Dkt. 12 at 9.) Again, though, the ALJ detailed Plaintiff's symptoms, drawn, *inter alia*, from Plaintiff's testimony and statements regarding his lifting capabilities, Plaintiff's reports in medical records that he worked through the pain to engage in normal activities, and a March 2022 treatment note indicating that Plaintiff's right wrist had no motion deficits, weakness, instability, or neurological dysfunction. (R. 25.) Considering the foregoing evidence, the ALJ determined that Plaintiff's de Quervain's tenosynovitis, while severe, did "not preclude his ability to perform full-time sustained work activity" with the lifting, carrying, pushing, and pulling weight limits set, with only frequent handling and fingering with the right arm. (R. 25-26.) The ALJ then generally adopted Dr. Fister's opinions from her report, which the ALJ found persuasive, departing only to make them more

9

favorable to Plaintiff by limiting handling and fingering to "frequent" (R. 22-23, 78) to accommodate Plaintiff's limitations.

Plaintiff's disagreement with the ALJ's finding that his abilities to handle and finger or lift, carry, push, or pull were not as limited as Plaintiff self-reported merely amounts to an improper invitation for the Court to reweigh the record evidence. *See Corbett v. Berryhill*, No. CIV-16-248-RAW-KEW, 2017 WL 3699763, at *3 (E.D. Okla. July 26, 2017) ("The fact DeQuervain's tenosynovitis was diagnosed does not translate into a significant limitation[] in fingering and handling."), *R. & R. adopted,* No. CIV-16-248-RAW-KEW, 2017 WL 3687925 (E.D. Okla. Aug. 24, 2017). *See also Becky C. v. Kijakazi*, No. 2:22-CV-24, 2023 WL 195830, at *4 (N.D. Ind. Jan. 17, 2023); *Luigi B. v. Saul*, No. 18 CV 7392, 2021 WL 83508, at *14 (N.D. Ill. Jan. 11, 2021).

Accordingly, substantial evidence supports the ALJ's RFC on both grounds Plaintiff challenges. *See Barrett v. Saul*, 822 F. App'x 493, 497 (7th Cir. 2020). Even if the ALJ's RFC analysis were flawed, any error was harmless; Plaintiff does not propose any accommodations or restrictions that might address any limitations he claims stem from his cancer treatments or de Quervain's tenosynovitis or cite any evidence the ALJ did not consider that indicates that he cannot perform as the ALJ found. *See Jozefyk v. Berryhill*, 922 F.3d 492, 498 (7th Cir. 2019); *Prochaska*, 454 F.3d at 737. In fact, although the Court permitted Plaintiff to file a reply (Dkt. 9), Plaintiff did not reply to the issues the Commissioner raised, including this one. (Dkt. 16 at 4.) *See Stephanie T. v. Saul*, No. 4:19CV101, 2020 WL 2316601, at *10 (N.D. Ind. May 11, 2020) ("Plaintiff failed to file a reply addressing the issues that the Commissioner has brought up in response to Plaintiff's arguments," including "identify[ing] specific, additional limitations that should have been included in the RFC"). Moreover, any error the ALJ may have made in setting lifting limits appears harmless because the VE testified that, if the limits were reduced to 20 pounds occasionally and ten pounds frequently, Plaintiff would still be able to perform his past relevant jobs "as generally

10

performed," although Plaintiff could not perform paralegal work "to the maximum lifting in the military." (R. 64.)

Plaintiff finally briefly suggests the ALJ should have ordered further medical evaluations before determining the RFC and making a disability determination. (Dkt. 12 at 13.) But the ALJ was entitled to infer, in the absence of any presentation of medical equivalency evidence or request for a reassessment, that Plaintiff did not believe that additional evidence would aid his case. *See Buckhanon ex rel. J.H. v. Astrue*, 368 F. App'x 674, 679 (7th Cir. 2010) ("[A]lthough ALJs bear some responsibility for developing the administrative record, . . ., they are also free to assume that a claimant represented by counsel has presented her strongest case for benefits[.]"); *Alejandrina A. v. Kijakazi*, No. 20-cv-4089, 2023 WL 2539239, at *8 (N.D. Ill. Mar. 16, 2023) (rejecting claimant's argument that, although she did not provide an expert opinion of medical equivalence, "the ALJ had a duty to 'recontact her treating providers or call upon an expert, to seek clarification on the issue of listing equivalence'" because claimant "was represented by an attorney," knew "of the state agency consultants' findings that her impairments did not medically equal [the relevant listing]," and had not "ask[ed] the ALJ to recontact the state agency consultants"). Plaintiff knew of the state-agency psychological consultants' opinions and Dr. Fister's opinion that he could perform medium work with some limitations without a handling or fingering limitation, yet Plaintiff did not present any additional opinion evidence or inform the ALJ of any belief that the opinions regarding Plaintiff's functioning were incomplete in any way. The ALJ thus did not err in not seeking further medical evaluations. *See Luigi B.*, 2021 WL 83508, at *7-8 (holding, as to Plaintiff's de Quervain's-related symptoms, that ALJ did not abuse his discretion in not requesting additional evidence where claimant had not presented any additional opinion from a treater or requested an updated opinion from a state-agency consultant despite being aware that state-agency consultants deemed him not disabled).

### C. The ALJ's Subjective Symptom Assessment Is Not Patently Wrong

Plaintiff argues that, in evaluating his subjective allegations, the ALJ did not sufficiently consider certain factors, including his daily activities; the location, duration, frequency, and intensity of pain and precipitating and aggravating factors; medication, treatment and other measures; and work history.[8]

"When assessing a claimant's subjective symptom allegations, an ALJ must consider several factors, including the objective medical evidence, the claimant's daily activities, his level of pain or symptoms, aggravating factors, medication, course of treatment, and functional limitations." *Charles B. v. Saul*, Case No. 19-cv-1980, 2020 WL 6134986, at *6 (N.D. Ill. Oct. 19, 2020) (citing 20 C.F.R. § 404.1529(c); 20 C.F.R. § 416.929(c); SSR 16-3p, 2017 WL 5180304, at *5, *7-8 (Oct. 25, 2017)). The ALJ must explain the subjective symptom evaluation in such a way that allows the Court to determine whether the ALJ reached that decision in a rational manner, logically based on the ALJ's "specific findings and the evidence in the record." *Id*. To warrant remand on this ground, the ALJ's assessment must be "patently wrong, which means that the decision lacks any explanation or support." *Murphy v. Colvin*, 759 F.3d 811, 816 (7th Cir. 2014). Plaintiff "cannot show reversible error simply by suggesting the evidence could support an alternative conclusion." *Maria S. v. Kijakazi*, No. 20-cv-6727, 2023 WL 7130376, at *8 (N.D. Ill. Oct. 30, 2023) (citing *Zoch v. Saul*, 981 F.3d 597, 602 (7th Cir. 2020); *L.D.R. v. Berryhill*, 920 F.3d 1146, 1152 (7th Cir. 2019) ("[E]ven if reasonable minds could differ on the ALJ's rejection

---

[8] As Plaintiff notes (Dkt. 12 at 3-4 & n.3), case law regarding subjective-symptom evaluations often references it in terms of the claimant's "credibility." For cases filed on or after March 28, 2016, like this case, [Social Security Ruling ("SSR")] 16-3p "eliminat[es] the use of the term 'credibility'" (that did appear in SSR 96-7p, which SSR 16-3p superseded) to "clarify that subjective symptom evaluation is not an examination of an individual's character." *See* SSR 16-3p, 2017 WL 5180304, at *2. Thus, although some cases cited within this memorandum opinion and order use the term "credibility," this Court avoids that term unless quoting from a case. The factors to consider when evaluating a plaintiff's subjective symptoms remain the same in SSR 16-3p and SSR 96-7p. *Compare* SSR 96-7p, 1996 WL 374186 (July 2, 1996), *with* SSR 16-3p, 2017 WL 5180304, at *7-8 (Oct. 25, 2017).

of [the claimant's] testimony, we will not reweigh evidence or substitute our judgment for the ALJ's.")).

An ALJ is not required to "rehash every detail each time he states conclusions on various subjects" or "discuss every detail related to every factor[.]" *Gedatus v. Saul*, 994 F.3d 893, 903 (7th Cir. 2021), and the ALJ's evaluation of the severity of Plaintiff's symptoms here is replete with references to the record evidence in support of his conclusions. The ALJ in his opinion addressed the factors (and subjects) Plaintiff lists, detailing Plaintiff's statements regarding his challenges with everyday tasks such as cleaning, Plaintiff's reported symptoms stemming from his conditions and treatments, the opinions and records of treating physicians and medical and psychological consultants, and Plaintiff's work. (R. 19-22, 23-29.)

Plaintiff faults the ALJ for not expressly iterating his long work history within the analysis of subjective symptoms, but "an ALJ's silence with respect to a claimant's work history [in the analysis of subjective symptoms] does not require reversal when [that] determination is otherwise supported by substantial evidence." *Chris W. v. Berryhill*, No. 17-cv-6532, 2018 WL 6305013, at *9 (N.D. Ill. Dec. 3, 2018); *see also Summers v. Berryhill*, 864 F.3d 523, 528-29 (7th Cir. 2017). The Court already has found that the ALJ's decision was supported by substantial evidence, and the ALJ properly considered a variety of factors listed within SSR 16-3p in reaching a decision.

That Plaintiff believes the ALJ should have differently assessed his subjective symptoms based upon his work history or any other factor within the analysis is not, without more, grounds for reversal. *See Jones*, 623 F.3d at 1162; *Rabdeau v. Kijakazi*, No. 22-CV-674, 2023 WL 5672596, at *9 (W.D. Wis. Sept. 1, 2023); *Luigi B.*, 2021 WL 83508, at *14; *Frank J. v. Saul*, No. 19-cv-3176, 2020 WL 6447928, at *5-6 (N.D. Ill. Nov. 3, 2020). It may be that "the ALJ's [subjective symptom] determination was not flawless," but, here, "it was far from 'patently wrong.'" *Simila v. Astrue*, 573 F.3d 503, 517 (7th Cir. 2009). The Court declines any invitation to

reweigh the evidence. *L.D.R.*, 920 F.3d at 1152; *Thompson K. v. Kijakazi*, No. 21-cv-1298, 2023 WL 7016621, at *7 (N.D. Ill. Oct. 25, 2023) (citing *Gedatus*, 994 F.3d at 901). Accordingly, the Court will not remand as to the ALJ's subjective symptom evaluation.

### III. CONCLUSION

For the foregoing reasons, Plaintiff's motion for summary judgment (Dkt. 12) is denied, and the Commissioner's motion (Dkt. 15) is granted. The decision of the Commissioner is affirmed.

ENTERED: March 18, 2024

_____
Hon. Keri L. Holleb Hotaling
United States Magistrate Judge